El Pueblo de Puerto Rico, peticionario, *v.* Julia León Cortijo, acusada y recurrida.

Número: CE-94-106          Resuelto: 30 de junio de 1998

*Pedro A. Delgado Hernández, Procurador General, Carlos Lugo Fiol, Subprocurador General,* y *Rose Mary Corchado Lorent, Procuradora General Auxiliar,* abogados de El Pueblo, peticionario; *Rubén Cerezo Hernández,* abogado de la recurrida.

## SENTENCIA

El 30 de enero de 1992 cuatro (4) jóvenes fueron asesinados y sus cuerpos encontrados en la carretera Núm. 1, sector La Muda de Guaynabo. Por estos hechos delictivos se presentaron acusaciones contra José Raúl Trinidad y Lester Tomás Hernández Cátala, por asesinato y otros delitos, y contra la recurrida, Julia León Cortijo, por el delito de encubrimiento.

Una vez concluida la presentación de la prueba de cargo, la defensa solicitó la absolución perentoria de la acusada, moción que fue declarada sin lugar. Dejado el caso en manos del Jurado, éste encontró a León Cortijo culpable del delito de encubrimiento. Acto seguido, la defensa reprodujo la moción de absolución perentoria antes de que se dictara la sentencia. En esta ocasión, el Tribunal Superior, Sala de San Juan, declaró con lugar la moción, dejando sin efecto el veredicto de culpabilidad rendido por el Jurado.

Luego del examen y análisis de la prueba presentada en este caso, la mayoría de los integrantes de este Tribunal concluyen que la resolución de la cual se recurre debe ser confirmada. En vista de ello, *se dicta sentencia para confirmar la resolución del antiguo Tribunal Superior de Puerto*

*Rico, Sala de San Juan, por la cual decretó la absolución perentoria de la recurrida Julia León Cortijo al amparo de la Regla 135 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, vigente.*

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente Señor Andréu García emitió una opinión de conformidad, a la cual se han unido la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Hernández Denton. Los Jueces Asociados Señores Fuster Berlingeri y Corrada Del Río concurrieron sin opinión escrita. Los Jueces Asociados Señores Negrón García y Rebollo López han emitido sendas opiniones disidentes.

(*Fdo.*) Isabel Llompart Zeno
*Secretaria del Tribunal Supremo*

— O —

Opinión de conformidad emitida por el Juez Presidente Señor Andréu García, a la cual se unen la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Hernández Denton.

El 30 de enero de 1992 cuatro (4) jóvenes fueron asesinados y sus cuerpos encontrados en la carretera Núm. 1, sector La Muda de Guaynabo. Por estos hechos delictivos se presentaron acusaciones contra José Raúl Trinidad y Lester Tomás Hernández Cátala por asesinato y otros delitos, y contra la recurrida, Julia León Cortijo, por el delito de encubrimiento.

Una vez concluida la presentación de la prueba de cargo, la defensa solicitó la absolución perentoria de la acusada, moción que fue declarada sin lugar. Dejado el caso en manos del Jurado, éste encontró a León Cortijo culpable del delito de encubrimiento. Acto seguido, la defensa repro-

dujo la moción de absolución perentoria antes de que se dictara la sentencia. En esta ocasión, el Tribunal Superior, Sala de San Juan, declaró con lugar la moción, dejando sin efecto el veredicto de culpabilidad rendido por el Jurado.

Inconforme, el Ministerio Público solicita la revisión de la resolución emitida por el Hon. José A. Torres Caraballo, mediante la cual absolvió perentoriamente a la recurrida. Expedido el auto de *certiorari*, el Tribunal ha dictado una sentencia hoy para confirmar dicha resolución. A continuación expondremos las razones por las cuales estamos conformes con la sentencia dictada.

## I

Una moción de absolución perentoria procede cuando la prueba presentada en el juicio "fuere insuficiente para sostener una convicción", según lo dispuesto en la Regla 135 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Esta regla establece, en lo pertinente, que:

> ... El tribunal a instancia propia o a instancia de un acusado decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos. 34 L.P.R.A. Ap. II, R. 135.

Recientemente, en *Pueblo v. Colón, Castillo*, 140 D.P.R. 564 (1996), tuvimos la oportunidad de abundar sobre el alcance y los propósitos de la moción de absolución perentoria. En esa ocasión aclaramos que existe suficiencia de prueba, en materia de absolución perentoria, cuando un Jurado razonable, adoptando la prueba de cargo, podría hallar culpable al acusado más allá de duda razonable.

Para llegar a esta determinación de suficiencia se requiere, en primer lugar, que el tribunal se cerciore de que el Ministerio Público haya aducido prueba, directa o circunstancial, de todos los elementos del delito imputado. Ahora bien, destacamos que el Estado no puede derrotar

una moción de absolución perentoria con tan sólo aducir el menor indicio de cualquier prueba de cargo.

Para poner al Jurado en posición de deliberar sobre la culpabilidad de un acusado, también se requiere que la prueba de cargo sea susceptible de ser creída, esto es, que como cuestión de derecho, permite ser sometida a un análisis de credibilidad.

En fin, la absolución perentoria persigue evitar que un ciudadano sea convicto sin el rigor que nuestro ordenamiento exige, una vez el tribunal se convence de que la prueba no puede rebasar las dudas que necesariamente habría de tener una persona razonable sobre la culpabilidad del acusado.

Aclarados estos principios, corresponde inicialmente definir los elementos del delito de encubrimiento, para luego examinar si, como aduce el Ministerio Público, la prueba presentada en el juicio cumple con el grado de suficiencia requerido para derrotar una moción de absolución perentoria; es decir, si se desfiló prueba de todos los elementos del delito, susceptible de ser creída, con la que el Jurado podía encontrar a la recurrida culpable más allá de duda razonable.

II

El encubrimiento se encuentra definido en el Art. 36 del Código Penal, 33 L.P.R.A. sec. 3173,([1]) y tipificado como delito en el Art. 236 del Código Penal, 33 L.P.R.A. sec. 4432, el cual dispone, en lo pertinente, que incurre en el delito de encubrimiento "[t]oda persona que con conocimiento de la ejecución de un delito ocultare al responsable

---

([1]) El Art. 36 del Código Penal, 33 L.P.R.A. sec. 3173, dispone: "Se consideran encubridores los que para eludir la acción de la justicia con conocimiento de la comisión de un delito, sin haber tenido participación en el mismo como autores, ocultaren al responsable del delito o procuraren la desaparición, alteración u ocultación de evidencia."

del mismo o procurare la desaparición, alteración u ocultación de prueba para eludir la acción de la justicia".

Como delito contra la función judicial, el delito de encubrimiento persigue sancionar la conducta intencional y específica de todo sujeto que ayude a una persona que ha delinquido a eludir la acción de la justicia. *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404, 413 (1988). El acto antijurídico se puede concretizar en cualquiera de sus dos (2) modalidades, ya sea al *ocultar al responsable* del delito o *al procurar la desaparición, alteración u ocultación de la prueba.* No podemos perder de vista que para que una persona responda por el delito de encubrimiento debe haber conocido la comisión del delito con posterioridad a su ocurrencia. De lo contrario, si hubiese acordado previamente su participación, su responsabilidad criminal no sería en calidad de encubridor, sino de coautor.

En síntesis, para que se configure el delito de encubrimiento es necesario que el sujeto: (1) tenga conocimiento de la comisión de un delito con posterioridad a su ocurrencia; (2) oculte al autor del delito o procure la desaparición, alteración u ocultación de la evidencia; (3) con el propósito de ayudar al autor del delito a eludir la acción de la justicia. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Inst. Desarrollo del Derecho, 1983, pág. 300.

## III

El Ministerio Público presentó a tres (3) testigos para probar los cargos por encubrimiento. En primer lugar, testificó Pedro Reynoso Esquilín, único sobreviviente de la masacre. Éste describió cómo él, junto a sus compañeros, robaron a punta de revólver un vehículo de motor, marca Honda Accord (T.E. de 25 de octubre de 1993, págs. 15–17), y que luego se encontraron con Mario Jorge de León, hijo de la recurrida, por lo que decidieron llevar el vehículo a

casa de Mario para desmantelarlo. Íd., pág. 22. Declaró que una vez comenzaron a desmantelar el vehículo, Mario y su grupo abrieron fuego contra el grupo que había robado el automóvil. Íd., pág. 24. Narró la forma en que brincó una verja adyacente a la marquesina, pudiendo así escapar y sobrevivir a la masacre. Íd., pág. 25.

Describió cómo Julia León Cortijo se asomó desde un lugar cercano a la marquesina unos cinco (5) minutos antes de iniciada la balacera. T.E. de 25 de octubre de 1993, pág. 27, y T.E. de 26 de octubre de 1993, pág. 108. Indicó que al ésta preguntarle a su hijo lo que sucedía, éste le ordenó que entrara a la casa y ella así lo hizo. T.E. de 25 de octubre de 1993, pág. 27.

Como segundo testigo de cargo declaró Ángel L. Negrón Meléndez, Agente del Cuerpo de Investigaciones Criminales (C.I.C.) que investigó el crimen y diligenció una orden de allanamiento a la casa de Mario, *donde se levantó considerable evidencia* (T.E. de 27 de octubre de 1993, págs. 57–64) y se descubrió que las paredes de la marquesina habían sido cubiertas recientemente con masilla para ocultar los impactos de bala. Íd., pág. 60. Aclaró que León Cortijo vivía en la casa contigua a la casa de Mario (íd., pág. 55) y que fue en la residencia de la recurrida donde consiguió la llave para entrar en casa de Mario. Íd., págs. 56–57. Expuso que citó a la recurrida *a una entrevista informal*, a la cual compareció en compañía de su hija. Añadió que al preguntarle sobre los hechos bajo investigación, ésta declaró que no sabía nada ni había escuchado nada. Íd., pág. 65.(²)

_____

(²) A continuación reseñamos la parte pertinente del interrogatorio del Fiscal Michael Corona al agente Negrón Meléndez, según surge de la transcripción de la evidencia:

"P  ¿Y qué transcurrió en esa entrevista?

"R  Pues, en la entrevista se le informó a ella los motivos por el cual [sic] había sido citada, se le preguntó si ella sabía algo de esos hechos, si ella había escuchado algún tiroteo o disparo en el sitio. Y ella informó que no sabía nada, que ella no había escuchado nada.

"P  ¿Usted le explicó la razón por [sic] la entrevista, usted le explicó en detalle?

Por último, el Ministerio Público presentó el testimonio de Lester Tomás Hernández Cátala, testigo ocular quien hizo alegación de culpabilidad por los hechos de este caso. T.E. de 28 de octubre de 1993, pág. 234. Declaró haber visto a León Cortijo asomarse a la marquesina minutos antes de los disparos. Íd., pág. 286. Narró como después de la matanza colocaron los cadáveres en el interior del Honda Accord. Íd., págs. 230–231. Atestiguó, además, haber observado a Rosita, hermana de Mario e hija de la recurrida, limpiar la marquesina con una manguera y que

"R   Sí, señor.

"P   ¿Qué fue lo que usted le explicó?

"R   Bueno, yo le expliqué que nosotros teníamos información de que en la residencia de su hijo, de Mario, había ocurrido un tiroteo donde habían ejecutado a cuatro personas. Le expliqué la fecha, la hora, le expliqué donde habían aparecido los cadáveres y en base a [sic] eso, pues, le pregunté si ella sabía algo de eso, si había escuchado y ella dijo que no sabía nada.

"P   Dijo que no sabía nada.

"R   Que no sabía nada, que no había escuchado nada, que no sabía nada.

"P   ¿Y que no había escuchado nada?

"R   No, señor.

"P   ¿Usted la entrevistó en alguna otra ocasión, además de esa fecha 4 de octubre, perdón, el 4 de febrero, discúlpeme?

"R   Sí, como ella nos informó que no sabía nada, que no había escuchado nada, pues, nosotros la citamos a ella para el siguiente día, para la oficina del Centro Metropolitano de Investigaciones y Denuncias con la idea de llevarla ante el [sic] fiscal Maritza Morales.

"P   La idea de llevarla ante la fiscal Maritza Morales para fines ¿de qué?

"R   Bueno, para fines de que ella prestara una declaración jurada haciendo constar de que ella no sabía nada del caso, de esa situación, del caso en sí, y que ella no había escuchado nada.

"P   Y qué paso, ¿se logró citar la persona?

"R   Sí, ella se citó, ella compareció.

"P   ¿Qué pasó ese día?

"R   Fue con el licenciado Cerezo y las circunstancias de que la fiscal Maritza Morales no estaba disponible, pues, no se le tomó la declaración jurada y se dejó ir.

"P   ¿Se hizo alguna otra gestión de citarla?

"R   No.

"P   ¿Usted llegó a hablar con el licenciado Cerezo?

"R   ¿Ese día?

"P   Sí.

"R   Sí, él estaba allí.

"P   ¿Y de qué hablaron?

"R   Le explicamos por qué ella había sido citada y, de hecho, él manifestó que ella no iba a declarar nada tampoco." T.E. de 27 de octubre de 1993, págs. 66–67.

León Cortijo se encontraba dentro de la casa mientras esto ocurría. Íd., pág. 232.

## IV

Según surge de la prueba de cargo presentada, el caso del Ministerio Público se cimenta, primordialmente, sobre el testimonio del agente Negrón Meléndez, a los efectos de que al entrevistar a la recurrida ésta aseguró no saber ni haber escuchado nada, y sobre el testimonio de Hernández Cátala, quien declaró que la recurrida se encontraba dentro de la casa de Mario mientras su hija limpiaba la marquesina con una manguera. Debemos aclarar que, contrario a la contención del Ministerio Público en su alegato, Hernández Cátala no testificó haber visto a la recurrida limpiar la marquesina con su hija, sino que la situó dentro de la residencia mientras esto ocurría.

Confiriéndole entero crédito a la prueba de cargo, de la cual se podría deducir que la recurrida conocía algo de los sucesos delictivos en cuestión, procede examinar si el meramente *negar conocimiento* de los hechos al agente Negrón Meléndez configura, *sin más*, el delito de encubrimiento.

De entrada debemos reconocer que, conforme a su sentido gramatical, el verbo *ocultar* reviste dos (2) acepciones: una positiva y otra negativa u omisiva. La modalidad positiva consiste en realizar una acción dirigida a esconder, tapar o disfrazar, mientras que la acepción negativa se conforma cuando se omite decir lo que se sabe. J. Córdova Roda y G. Rodríguez Mourullo, *Comentarios al Código Penal*, 1ra reimp., Barcelona, Ed. Ariel, 1976, T. 1, pág. 926; P. Gómez Pavón, *El encubrimiento: artículos 17 y 18 del Código Penal*, Madrid, Ed. Trivium, 1988, págs. 84–85; C. Creus, *Derecho Penal*, 2da ed., Buenos Aires, Ed. Astrea, 1988, T. 2, págs. 352–353.

Ahora bien, Gómez Pavón nos aclara que si bien "gra-

maticalmente ocultar puede revestir las dos formas antes indicadas, conviene analizar si esto es posible dentro" del estatuto penal. Gómez Pavón, *op. cit.*, pág. 84. En este contexto, Rodríguez Mourullo señala que "[p]ara que la omisión sea penalmente relevante y pueda fundamentar una responsabilidad a título de encubrimiento, será preciso que sobre el sujeto pese un específico deber jurídico de obrar". (Escolio omitido.) Córdova Roda y Rodríguez Mourullo, *op. cit.*, pág. 927. En igual sentido se expresa Gómez Pavón al señalar que "la omisión podrá considerarse como forma de ocultación siempre que un previo deber jurídico imponga una determinada actividad". Véanse: Gómez Pavón, *op. cit.*, pág. 85; E. Cuello Calón, *Derecho Penal*, 14ta ed., Barcelona, Ed. Bosch, 1975, T. II, Vol. 1, pág. 672; F. Puig Peña, *Derecho Penal*, 5ta ed., Barcelona, Eds. Desco, 1959, T. II, Vol. 2, pág. 292; C. Conde-Pumpido Ferreiro, *Encubrimiento y receptación: Ley de 9 de mayo de 1950*, Barcelona, Ed. Bosch, 1955, págs. 258–262; Creus, *op. cit.* Véase, además, M.C. Bassiouni, *Substantive Criminal Law*, Illinois, Charles C. Thomas Pub., 1978, págs. 165–166.

Nuestro Derecho Penal no reconoce como conducta punible la omisión de dar cuenta a las autoridades públicas de un delito cuando se adviene en conocimiento de su comisión. Por consiguiente, en vista de que en Puerto Rico no existe un deber específico de obrar, no es posible incurrir en encubrimiento por conducta omisiva, o sea, por guardar silencio sobre una conducta delictiva conocida.

Recordemos que el principio de legalidad proscribe instar una acción penal contra persona alguna por hechos que no estén expresamente definidos como delito, al igual que prohíbe la creación de delitos, penas o medidas de seguridad por analogía. Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031. Esto no excluye que, en ciertas circunstancias y bajo juramento, una persona pueda ser compelida a divulgar información sobre un delito, sujeto a lo provisto en el Có-

digo Penal en torno al delito de perjurio. 33 L.P.R.A. sec. 4421.

Como establecimos previamente, para incurrir en el delito de encubrimiento debe mediar *la intención específica de ayudar al autor de un delito a eludir la acción de la justicia.* En vista de su naturaleza específica, para configurar este elemento se requieren actos de los cuales se pueda inferir claramente *el propósito de asistir a un sujeto en evadir la justicia.*

A diferencia de los casos de desaparición o de alteración de la prueba —actos afirmativos en los cuales es palpable la intención de asistir al autor del delito— el ámbito de los interrogatorios plantea una situación particular que requiere de un examen cuidadoso del testimonio ofrecido para evaluar si de la manifestación se puede deducir esta intención específica. *En este contexto, la intención se puede inferir de declaraciones en las que de modo afirmativo se presenta una coartada engañosa o se ofrece información falsa para despistar o desviar la atención de las autoridades o para confundir la investigación.* Sin embargo, cuando en un interrogatorio se niega, *sin más,* conocimiento sobre unos hechos delictivos, que se suponen conocidos, no se conforma el acto afirmativo que intima el delito de encubrimiento. La conducta pasiva, consistente en la mera negación de conocimiento, no es suficiente para demostrar esta intención específica de ayudar al autor del delito a evadir la justicia.

A estos efectos coincide la doctora Nevares-Muñiz al señalar que para demostrar la intención de un ciudadano de ayudar al responsable de un delito a eludir la acción de la justicia, no basta con que el sujeto no haya informado a las autoridades la comisión de un delito o el nombre del presunto autor, cuando éste se conoce. Es necesaria la ejecución de actos adicionales como "ayudar al autor del delito principal a escapar, participar en actos dirigidos a desapa-

recer la evidencia, ... *dar información falsa a las autorida-
des con el propósito de confundir la investigación"*. (Énfasis
suplido.) D. Nevares-Muñiz, *Código Penal de Puerto Rico,
revisado y comentado*, 3ra ed. rev., Hato Rey, Ed. Inst. De-
sarrollo del Derecho, 1995, pág. 377.

No podemos ignorar que como corolario del principio de
legalidad, y en virtud del mandato constitucional sobre el
debido proceso de ley, los estatutos penales deben ser in-
terpretados restrictivamente, resolviendo toda duda en fa-
vor del acusado. *Pueblo v. De León Martínez*, 132 D.P.R.
746 (1993); *Pueblo v. Rodríguez Jiménez*, 128 D.P.R. 114
(1991); *Pueblo v. Arandes de Celis*, 120 D.P.R. 530, 538
(1988); *Pueblo v. Vargas, Alcaide*, supra, pág. 409; *Pueblo v.
Ríos Nogueras*, 114 D.P.R. 256, 260 (1983); *Pueblo v. Uriel
Álvarez*, 112 D.P.R. 312 (1982).

A modo comparativo, y con carácter persuasivo, nos per-
catamos de que son pocas las jurisdicciones que se han
enfrentado a una situación fáctica similar a la del caso de
marras.[3] De hecho, los tratadistas de orientación civilista
que hemos consultado no contemplan tal situación al co-
mentar sobre el delito de encubrimiento. Véanse: M. Jaén
Vallejo y otros, *Código Penal Comentado*, Madrid, Eds.
Akal, 1990, págs. 125–129; Gómez Pavón, *op. cit.*; Creus,
*op. cit.*, págs. 351–357; J.M. Rodríguez Devesa, *Derecho Pe-
nal español: parte general*, 8va ed., Madrid, Artes Gráficas
Carasa, 1981, págs. 828–838; Cuello Calón, *op. cit.*, págs.
672–673 y 681–685; C. Fontán Balestra, *Tratado de Dere-*

[3] Recurrimos a otras jurisdicciones para ver la manera en que han confrontado
situaciones como la de autos, sin perder de perspectiva que nuestro principio de
legalidad controla la interpretación de los estatutos penales y prohíbe crear estatu-
tos por analogía.

Debemos recordar que nuestro Código Penal se ha beneficiado tanto de la tra-
dición civilista como del derecho común anglosajón. De esta forma, ha recibido la
influencia de fuentes civilistas como los proyectos de código penal elaborados en
Argentina y Uruguay, así como de fuentes anglosajonas como el Código Penal Modelo
del *American Law Institute* y el Código Penal de California. D. Nevares-Muñiz, *Evo-
lution of Penal Codification in Puerto Rico: A Century of Chaos*, 51 Rev. Jur. U.P.R.
87, 134 (1982). Véase, además, D. Nevares-Muñiz, *Análisis crítico del Código Penal
de Puerto Rico*, XXIV Rev. Jur. U.I.A. 5, 14 (1989). ·

*cho Penal: parte especial*, 2da ed., Buenos Aires, Ed. Abeledo-Perrot, 1980, T. VII, págs. 439–475; Rodríguez Mourullo, *op. cit.*, págs. 898–947; A. Quintano Ripollés, *Curso de Derecho Penal*, Madrid, Ed. Rev. Der. Privado, 1963, Vol. I, págs. 251–254; Puig Peña, *op. cit.*, págs. 287–297; Conde-Pumpido Ferreiro, *op. cit.*; S. Soler, *Derecho Penal Argentino*, 3era reimp., Buenos Aires, Ed. TEA, 1956, págs. 268–286.

En cambio, algunas jurisdicciones estatales de Estados Unidos han considerado este supuesto y sirven de apoyo a nuestra posición, sosteniendo abrumadoramente que *la mera negación* de conocimiento de los hechos no es suficiente para probar la intención específica de ayudar al autor del delito a evadir la acción de la justicia.

En *Stephens v. State*, 734 P.2d 555 (Wyo. 1987), el Tribunal Supremo del estado de Wyoming se enfrentó a una situación análoga a la del caso de marras. Stephens había sido informado de la comisión de un delito por su autor. Cuando los oficiales de la Policía lo interrogaron al respecto, Stephens negó tener conocimiento de los sucesos delictivos por los cuales se le interrogaba. Sin embargo, quince (15) minutos después, la Policía confrontó a Stephens con información que había ofrecido su novia, por lo que cambió su testimonio y admitió que conocía los sucesos. En vista de lo anterior, se presentaron cargos en su contra por encubrimiento y resultó convicto. El Tribunal Supremo de Wyoming revocó la convicción y, a tales efectos, aclaró:

> ... merely denying knowledge of the principal's involvement in a crime will not give rise to a charge of accessory after the fact. ... A mere denial of knowledge is to be differentiated from an "[a]ffirmative statement of facts tending to raise any defense for (the principal), or a statement within itself indicating an effort to shield or protect (the principal)." ... Such an affirmative statement would be such as supplying a false alibi. This amounts to more than passive nondisclosure. ...

In the case here, appellant did nothing more than passively deny knowledge of Van Buren's involvement in the burglary. *Stephens v. State*, supra, pág. 557.

De igual modo se ha expresado el Tribunal Supremo del estado de Oregon en *State v. Clifford*, 502 P.2d 1371 (Or. 1972). El peticionario había conversado con un sujeto llamado Wright, quien previamente había asesinado a dos (2) personas y secuestrado a un niño. La policía le preguntó a Clifford si había visto a Wright o al niño, a lo que éste respondió en la negativa. Clifford fue acusado y convicto por el delito de encubrimiento. Al revocar, el Tribunal Supremo de Oregon realizó una exégesis del delito de encubrimiento en el derecho común anglosajón. Conforme a este análisis, manifestó:

... The examples describing criminal conduct uniformly consist of an affirmative act from which the intention to aid an offender to escape arrest, conviction or punishment is obvious. None of the examples indicate that a mere denial of knowledge of the whereabouts of an offender at some time in the past would amount to accessorial conduct. *State v. Clifford*, supra, pág. 1374.

De otra parte, en *Tipton v. State*, 72 S.W.2d 290 (1934), el Tribunal de Apelaciones Criminales del estado de Texas, ante hechos parecidos, estableció:

... The record before us reveals no more than that, upon being questioned by the officers concerning the death of the deceased, the witness stated to them that she knew nothing about the matter, notwithstanding appellant had previously stated to her that he had killed a man in Comanche. This statement was not an affirmative statement of facts tending to raise any defense for appellant, or a statement within itself indicating an effort to shield or protect appellant. *Tipton v. State*, supra, pág. 293.

Esta decisión fue reafirmada en *Findley v. State*, 378 S.W.2d 850, 852 (1964).

Asimismo se ha pronunciado el Tercer Distrito del Tribunal de Apelaciones de Illinois, al expresar en *People v. Hammond*, 573 N.E.2d 325, 331 (1991): "... an affirmative

act, beyond the mere failure to come forward with information, and beyond even an affirmative denial of knowledge of any information, is required to render one liable." (Citas omitidas.) Véase, además, *People v. Thomas*, 556 N.E.2d 721 (1990).

Incluso en California, de donde proviene nuestro delito de encubrimiento y donde, a diferencia de Puerto Rico, no es un principio rector la interpretación restrictiva de los estatutos penales,[4] se requiere un acto afirmativo como, por ejemplo, presentar una coartada engañosa, indicativa del propósito de desviar la atención de las autoridades y de asistir al autor de un delito a evadir la justicia. *People v. Duty*, 74 Cal.Rptr. 606, 609 (1969).

En resumen, somos de la opinión que para que pueda quedar configurado el delito de encubrimiento, según se define en el Art. 36 de nuestro Código Penal, *supra*, se requiere establecer más allá de duda razonable la comisión por parte del imputado de aquellos actos que conduzcan claramente al propósito de asistir al autor de un delito a eludir la acción de la justicia. Por lo tanto, cuando en un interrogatorio conducido en la etapa investigativa de un crimen se niega, sin más, el conocimiento de hechos delictivos que se suponen conocidos, no se conforma el acto afirmativo que demuestra la intención específica de ayudar al autor del delito a evadir la acción penal.

V

Es preciso destacar que el delito de encubrimiento no es un delito de resultado, sino uno de conducta. Es decir, el hecho de que los responsables del delito principal se beneficien del silencio de una persona, no convierte a esta última en encubridora.

---

[4] "The rule of common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." 47 Cal. Penal Code Sec. 4, pág. 4 (1970).

Debemos recordar que, como máximos intérpretes de la ley, no podemos prescindir del análisis metódico de *todos* los elementos del delito, conforme a los hechos específicos de cada caso. Para encontrar a una persona incursa en conducta constitutiva de delito, resulta indispensable que concurran todos los elementos del tipo.

Tampoco podemos perder de perspectiva que, aunque un testimonio falso puede servir para configurar el delito de encubrimiento, no todo testimonio falso constituye una conducta encubridora. Esto no implica que la mentira queda impune en nuestro estado de derecho. Todo lo contrario, dentro del esquema formulado y aprobado por la Rama Legislativa se trata con especial rigor el testimonio falso ofrecido a las autoridades competentes. El delito de perjurio, que tipifica esta conducta, dispone una pena fija diez (10) veces mayor que la dispuesta para el delito de encubrimiento cuando el delito principal cometido sea menos grave, y tres (3) veces mayor cuando el delito principal cometido sea grave. Art. 225 del Código Penal, 33 L.P.R.A. sec. 4421.

## VI

Según reveló el agente Negrón Meléndez, León Cortijo se limitó a decir que no sabía ni había escuchado nada, sin ofrecer información conducente a desviar la atención de la Policía o confundir la investigación. Esta conducta pasiva, por sí sola, no presupone una intención específica de ayudar a los autores del delito a eludir la acción de la justicia. Más bien, es una conducta demostrativa de un interés personal en mantenerse al margen y no verse involucrada en un proceso criminal. En ausencia de un acto afirmativo, no podemos concluir que su conducta responde al propósito de asistir a los autores del delito a evadir la justicia.[5]

---

[5] De un análisis sereno del testimonio vertido por el agente Negrón Meléndez en el juicio, no surge claramente cuáles eran los hechos que debía haber conocido la

Ante la ausencia de prueba sobre uno de los elementos del delito de encubrimiento —la intención específica de asistir al autor del delito a eludir la acción de la Justicia— procede que confirmemos la resolución del tribunal de instancia por medio de la cual se absolvió perentoriamente a León Cortijo.

De un análisis sereno y ponderado de la transcripción de la evidencia, y con el beneficio de los alegatos de las partes, es evidente que no procede reinstalar el veredicto del Jurado, por estar éste basado en prueba insuficiente, especulativa e hipotética. Ni siquiera nos encontramos ante prueba circunstancial que dé cabida a inferencias razonables.

En vista de los fundamentos expuestos anteriormente, consignamos nuestra conformidad con la sentencia dictada por este Tribunal hoy, mediante la cual se confirma la resolución del antiguo Tribunal Superior, Sala de San Juan, que decretó la absolución de la recurrida.

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Rebollo López.

I

*En recta adjudicación, es axiomático que los hechos determinan el Derecho; no a la inversa.* Por esta razón discre-

---

acusada cuando éste la entrevistó durante el curso de la investigación. Dicho testimonio resulta sumamente vago a los fines de determinar específicamente cuál fue la información que se le requirió a ésta y cuáles fueron realmente los hechos que negó saber la acusada. Es probable que ésta realmente creyera que nada sabía de los hechos por no haberlos presenciado.

Esta probabilidad se fortalece por una total falta de profundidad en el interrogatorio al que fue sometida la acusada durante la entrevista que le hiciera el mencionado agente.

Mal puede decirse que la referida conducta por parte de la acusada tuvo el efecto de "ocultar al responsable del delito o de procurar la desaparición, alteración u ocultación de la prueba.

pamos del análisis jurídico en *abstracto*. Como tal no supera la *realidad fáctica* de que la acusada Doña Julia León Cortijo —culpable de *encubrimiento* por veredicto de jurado, que el ilustrado tribunal de instancia (Hon. José A. Torres Caraballo, Juez) dejó sin efecto *erróneamente*— conoció los pormenores de los cuatro (4) asesinatos cometidos en la residencia *contigua*, que pertenecia a su hijo Mario Jorge De León (Orejas), traficante de drogas. Además, supo de las medidas *posteriores* allí adoptadas para encubrir, ocultar y borrar toda huella de lo que públicamente se conoce como la *Masacre de la Muda*.[1]

Específicamente, Doña Julia se encontraba a pasos de la casa de su hijo Mario, *antes, durante y después de los asesinatos*. Lo vio allí junto a los acusados José R. Trinidad Jorge, Lester Tomás Hernández Cátala y otros, quienes estaban *fuertemente armados*. Oyó los disparos de armas de alto calibre, los cuales unidos a la magnitud de la matanza, generaron un ruido estruendoso, susceptible de ser escuchado por toda persona que estuviera en los alrededores. Se percató también esa noche *cuando su hija lavó la marquesina para limpiar la sangre. Al igual que los Jurados, no podemos ser ingenuos.* Por la forma de la masacre, los múltiples y las ruidosas detonaciones de las cinco (5) potentes armas de fuego, es *increíble* que ella le afirmara al agente investigador Ángel Negrón Meléndez —luego de que éste le *explicara* los detalles— *que no vio nada ni escucho los disparos.*

Doña Julia conoció de los disparos y asesinatos allí cometidos, el traslado de los cadáveres, la alteración de la

---

[1] Como *hechos probados e inferencias razonables del Jurado* tenemos que: Doña Julia se encontraba en su casa *antes* del tiroteo; *vio* a su hijo Mario y a los demás acompañantes, quienes estaban *fuertemente armados*, y preguntó qué pasaba; Mario le ordenó que se metiera para adentro y ella así lo hizo; *allí estaba al momento del ruidoso tiroteo y el traslado de los cadáveres; observó a su hija limpiar la sangre de la marquesina*; al haber visto hombres armados, escuchar tiros y ver a su hija limpiar sangre, *sabía que allí se habían cometido unos* delitos; dijo a la Policía no saber *ni haber oído nada*; sin embargo, cuando la Policía realizó el registro de la casa de Mario, ella tenía la llave en su poder; se encontró evidencia incriminatoria y de que se había tratado de ocultar los efectos físicos de la balacera.

prueba para ocultar a los autores de los crímenes, el lavado de la sangre e *intencionalmente los encubrió para ayudar y proteger a su hijo Mario.*([2]) La existencia de una *relación materno-filial no es eximente.*

Para tratar de sostener la frágil tesis de la insuficiencia de prueba, la opinión de conformidad minimiza esa conducta, caracterizándola de que ella "conocía *algo*([3]) de los sucesos delictivos en cuestión". (Énfasis suplido.) Opinión de conformidad, pág. 401. *Es un eufemismo.*([4]) La prueba revela contundentemente un conocimiento cabal de los asesinatos y que *su conducta posterior fue intencionalmente encubridora; no meramente pasiva ni silenciaria.* De hecho, tenía la llave de control y acceso de la residencia de su hijo, escena de los crímenes. El agente investigador Negrón Meléndez *le explicó en detalle* los pormenores de la investigación policiaca (día, hora, sitio, su propietario, muertes, armas, disparos, etc.). Sin embargo, ella no sólo mantuvo silencio, sino que deliberadamente optó por decir que *no sabía nada ni tampoco había oído disparos. En otras palabras, al ser cuestionada por las autoridades en la etapa investigativa, dio información falsa vital —no haber escuchado los disparos— lo cual con vista a la balacera y estrepitoso ruido pretendió desorientar y confundir la investigación.* De esa manera, *no sólo ocultó* evidencia que

---

([2]) La opinión de conformidad del Juez Presidente Señor Andréu García —a la cual se unen la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Hernández Denton— nos dice que su posición se sostiene "abrumadoramente" en cinco (5) casos. Nos cita tres (3) extractos de unos casos claramente distinguibles e inaplicables: *Stephens v. State*, 734 P.2d 555 (Wyo. 1987); *State v. Clifford*, 502 P.2d 1371 (Or. 1972), y *Tipton v. State*, 72 S.W.2d 290 (1934). Véase la opinión de conformidad, págs. 405–406. En estos casos los tribunales absolvieron al concluir que los allí acusados se limitaron a negar pasivamente su conocimiento de los eventos delictivos *en protección de sus exclusivos intereses personales, sin que el Fiscal desfilase prueba indicativa de una intención de ayudar al autor de los hechos.*

([3]) *Algo*, pronombre que "2. ... denota cantidad indeterminada, grande o pequeña, *pero más especialmente lo segundo*". (Énfasis suplido.) *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 70.

([4]) *Eufemismo*, "[m]anifestación suave o decorosa de ideas cuya recta y franca expresión sería dura o malsonante". *Diccionario de la Lengua Española*, op. cit., pág. 653.

pudo haber ofrecido, *sino que intencionalmente suministró evidencia falsa (no ocurrieron allí los disparos), obstaculizando y entorpeciendo la persecución de su hijo, presunto sujeto activo de los asesinatos.*

Ciertamente nuestro Código Penal no tipifica el delito de *omisión de denunciar*;[5] esto es, que no impone la obligación legal a ningún ciudadano que presencia un delito de, *sua sponte*, acudir a las autoridades y denunciar al delincuente. Sin embargo, comete el *delito de encubrimiento* quien, en el curso de una investigación de la Policía o Ministerio Fiscal, es preguntado —con conocimiento de unos disparos y cuatro (4) asesinatos, la posterior desaparición de los cadáveres y la alteración de la escena (el lavado de la sangre)— dice no saber nada y *niega haber oído los disparos.*

Más allá de duda razonable, *Doña Julia activa y afirmativamente incurrió en una conducta intencionalmente específica de desviar y confundir la investigación y sospechas policiacas, producto de la confidencia que tenían con-*

---

[5] "Pero, pese al actual matiz público de los delitos, contra los cuales la sociedad toda está interesada en defenderse, *todavía late en el fondo de la mentalidad la idea del carácter privado del crimen, cuya persecución sólo al perjudicado compete excitar, y cuya existencia no debe obligarse a denunciar a quienes, no habiendo sido directamente afectados por él, opten por silenciarlo.* Por ello, aunque doctrinalmente es evidente que la obligación de denunciar a todos constriñe, que su omisión impide o retrasa la persecución del delito, favoreciéndose así su impunidad y la de su autor, lo cierto es que los comentaristas han tendido a considerar la denuncia como un derecho, más que como un deber, refutándose la obligatoriedad de su exigencia con una doctrina extrajurídica en la que se habla como máximo argumento de la 'impotencia de la ley para hacer de la delación una virtud civil' (Groizard, loc. cit.), y de la 'conciencia que rechaza aquí la lógica y se subleva contra la Ley' (Pacheco, obra citada, I, pág. 268). Jurídicamente se ha intentado fundamentar la impunidad de tal omisión en el aspecto pasivo de la conducta o en la imposibilidad de exigir la denuncia en muchos hechos en los que el conocimiento de su carácter delictivo requiere un estudio jurídico que no está al alcance de todos, olvidando así que la omisión también puede ser delito y que esa ignorancia de la antijuricidad del hecho a denunciar podría alegarse a favor de la ausencia del elemento congnoscitivo del dolo en quien omitió por tales razones, fundamentándose en ello la impunidad de esa conducta concreta.

"Modernamente se observa una reacción a favor del carácter delictivo de la omisión de denunciar que se sanciona en los Códigos más progresivos." (Escolio omitido y énfasis suplido.) C. Conde-Pumpino Ferrero, *Encubrimiento y Receptuación: Ley de 9 de mayo de 1950*, Barcelona, Ed. Bosch, 1955, pág. 260.

tra su hijo Mario, encubriendo y actuando contra la función judicial. Nos explicamos.

## II

El *delito de encubrimiento*, según tipificado por nuestros legisladores,[6] lo comete quien *"para eludir la acción de la justicia con conocimiento de la comisión de un delito*, sin haber tenido participación en el mismo como autor, ocultare al responsable del delito o *procurare* la *desaparición, alteración u ocultación de evidencia"*. (Énfasis suplido.) 33 L.P.R.A. sec. 3173.

"El encubrimiento es, por propia construcción lexicográfica, el acto de *ocultar o tapar alguna cosa*. Trasladándonos al terreno penal, *la acción tendente a ocultar o tapar algún delito*, esto es, *a impedir o entorpecer su descubrimiento*, persecución y castigo." (Énfasis suplido.) C. Conde-Pumpido Ferrerro, *Encubrimiento y receptación: Ley de 9 de mayo de 1950*, Barcelona, Ed. Bosch, 1955, pág. 10.

Nuestra doctrina jurisprudencial nos recuerda que

> ... el encubrimiento es un *delito contra la administración de la justicia*. Su objetivo es *obstaculizar la persecución del presunto sujeto activo del delito* y la comprobación del hecho sancionable. J. Miró Cardona, *Borrador y notas explicativas al proyecto del Código Penal*, San Juan, Oficina de Justicia Criminal, 1972, T. 2, pág. 371; E. Gavier, *El presupuesto fundamental del delito de encubrimiento*, 3 Rev. Der. Penal 333, 337 (1947).
> El objeto de la sanción es el *peligro creado a la sociedad por el comportamiento de una persona que está dispuesta a ayudar a*

---

[6] El Art. 236 del Código Penal dispone:

"Toda persona que con *conocimiento de la ejecución de un delito* oculte al responsable del mismo o procurare la desaparición, *alteración u ocultación de prueba para eludir la acción de la justicia*, incurrirá en las siguientes penas:

"(a) Si el delito cometido fuere grave, reclusión por un término fijo de dos (2) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de tres (3) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.

"(b) Si el delito cometido fuere menos grave, reclusión por un término que no excederá de seis (6) meses o multa que no excederá de quinientos (500) dólares." (Énfasis suplido.) 33 L.P.R.A. sec. 4432.

*otro a eludir la acción de la justicia. Model Penal Code* Sec.
242.2 (Proposed Official Draft 1962) y *Tentative Draft* no. 8,
1958, Comentarios, págs. 129–130. ... Lo que *se busca evitar y
castigar es el hecho de que el encubridor manifieste su deseo de
actuar contra la función judicial* mediante el encubrimiento del
responsable de una violación penal o la *desaparición o altera-
ción de la prueba. Model Penal Code*, supra, pág. 226; E. Cuello
Calón, *Derecho Penal*, 18va. ed., Barcelona, Ed. Bosch, 1981,
Vol. 2, pág. 681.

En conclusión, el delito de encubrimiento busca evitar que
las personas ayuden a otras a evadir la justicia. Busca *castigar
a quienes tratan de entorpecer la acción investigativa de la jus-
ticia* sobre actos que aparecen 'con las formas exteriores de un
delito'. Gavier, *op. cit.*, pág. 338. Miró Cardona, *op. cit.*, pág.
369. (Énfasis suplido.) *Pacheco v. Vargas, Alcaide*, 120 D.P.R.
404, 413–415 (1988).

Vemos, pues, que es encubridor aquel que, con conoci-
miento de la comisión de un delito, *oculta* evidencia. Así,
*ocultar* es esconder, tapar, disfrazar o encubrir a la vista;
es la acción de *callar advertidamente* lo que se *pudiera* o
debiera decir, o disfrazar la verdad. *Diccionario de la Len-
gua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992,
pág. 1038.

Ocultar al culpable de un delito tiene dos (2) modalida-
des: positiva y negativa. La *positiva* consiste en realizar
una acción tendente a esconder, tapar o disfrazar, y la *ne-
gativa*, omitir el facilitar la información necesaria. *Se
puede evitar el conocimiento de algo mediante una activi-
dad que oculte el hecho realizado, como ocurre, por ejemplo,
con el silencio.* P. Gómez Pavón, *El encubrimiento: artículos
17 y 18 del Código Penal*, Madrid, Ed. Trivium, 1988, pág.
84.

En este sentido el acto de ocultar puede incluir "cual-
quier acción tendente a conseguir el no descubrimiento del
hecho anteriormente perpetrado, y esto se puede realizar
tanto actuando directamente sobre el cuerpo, efectos o ins-
trumentos del delito, *escondiéndolo, como disfrazando la
verdad, alterándola, ya que ambas formas son factibles de*

*acuerdo con el sentido gramatical del verbo ocultar".* (Énfasis suplido.) Gómez Pavón, *op. cit.,* pág. 84.

En cuanto a la forma negativa (omisiva), ésta "consistirá *en no decir nada,* en silenciar la información que podría llevar a ese conocimiento ...". (Énfasis suplido.) Goméz Pavón, *op. cit.,* pág. 85. La omisión se diferencia de la *alteración de lo que se conoce*; en este caso, la conducta no es omisiva, consiste en un hacer, *en falsear lo que se sabe para cegar las posibles fuentes de conocimiento que lleven al descubrimiento del hecho.* Para que la omisión pueda "dar lugar a responsabilidad a título de encubridor *es preciso que exista un 'específico deber jurídico de obrar'".* (Énfasis suplido.) Íd.

Algunos autores consideran que cualquier tipo de asistencia brindada al criminal para ocultarlo de ser aprehendido, convicto o castigado, convierte a la persona que lo asistió en un encubridor. W.R. La Fave, *Substantive Criminal Law,* Minnesota, Ed. West Publishing Co., 1986, Vol. II, Sec. 6.9, pág. 168. Sin embargo, aunque el mero hecho de no denunciar o arrestar al criminal no es suficiente, se ha decidido que *dar información falsa a un policía, para desviar las sospechas que se tienen sobre un criminal,* así como dar un testimonio falso ante un requerimiento formal, constituyen *encubrimiento.* La Fave, *op. cit.,* pág. 169; D. Nevares-Muñiz, *Código Penal de Puerto Rico, revisado y comentado,* 3ra ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1995, pág. 377.

## III

Un minucioso examen de la voluminosa transcripción de los testimonios, prueba documental (informes, declaraciones, fotografías y vídeo) revela, en lo pertinente, que el 20 de enero de 1991 Pedro Reynoso Esquilín, de veinte (20) años de edad, se encontraba en el residencial Alturas de Cupey con Rafael Nieves Figueroa (c/p Grillo) y Julio Cé-

sar Mejías Rodríguez (Julito), cuando llegó Julio Rodríguez Berberena a buscarlos en un automóvil Oldsmobile. Fueron y recogieron a Daniel Christopher Ocasio Henkis (c/p Deño) quien se encontraba en la casa de su novia. Decidieron dar una vuelta por el Condado y luego, mientras se dirigían hacia Cupey, vieron un Honda Accord color verde. Acordaron seguirlo. Aprovecharon que una de las personas en el Honda Accord se bajó y, mediante amenazas e intimidación —portaban tres (3) pistolas de 9mm— robaron dicho auto.

Así las cosas, se dirigieron hacia la autopista y decidieron ir hasta Cabo Rojo en los dos (2) vehículos. En Cabo Rojo se quedaron en casa de un amigo hasta el otro día, cuando regresaron a Cupey. De allí fueron hasta el área de *Chapero* en Caimito para guardar el Honda. Hablaron con un amigo de Deño y permanecieron, en una calle sin salida, hablando por espacio de media hora. Llegó Mario (c/p Orejas), *hijo de Doña Julia*, quien vivía en el lugar y se dedicaba al tráfico de drogas. Vino acompañado por José Raúl Trinidad Jorge y tres (3) personas más. Mario estaba armado con un Magnum 357; José Raúl y Armando con rifles M-14; Antonio portaba una escopeta calibre 12 recortada, y Andy una metralleta corta (9mm). Mario los invitó a que guardaran el Honda en su casa para sacarle unas piezas; éstos accedieron y estacionaron el Honda frente a la casa de Mario. Luego, Mario les abrió el portón y subieron el auto en reversa a la marquesina de la referida casa, ubicada en la Calle Fidalgo Díaz, Km. 1 Hm. 1, sector Chapero, barrio Caimito, Río Piedras. *La casa de Mario quedaba al lado, como a veinte (20') pies de la casa de su madre, la acusada Doña Julia.*

Reynoso Esquilín y Julito comenzaron a aflojar las tuercas de los aros de la parte trasera del Honda para ponérselos al Porche de Mario. Mientras tanto, Mario habló sobre unas deudas por drogas y que quería matar a unos tales Tito Cabezón y el Cubano. En determinado momento

—aproximadamente cinco (5) minutos antes de comenzar unos disparos— Reynoso Esquilín y Lester Tomás Hernández Alcalá *vieron a la acusada, Doña Julia, asomarse.* Ella los *vio con las armas y preguntó qué pasaba.* T.E., Vol. I, pág. 27. Su hijo Mario le dijo que se "metiera para adentro, que no pasaba ná". Ella se fue y entró a la casa por una puerta lateral.([7])

Reynoso Esquilín y los demás continuaron aflojando las tuercas de los aros y, sorpresivamente, comenzaron unos disparos provenientes de las armas de Mario, José Raúl, Armando, Antonio y Andy. T.E., Vol. I, pág. 24. Los muchachos cayeron heridos. Julito, que se encontraba al lado de Reynoso Esquilín, recibió un escopetazo en la cabeza. Reynoso Esquilín recibió una herida en la mano derecha, hombro y muslo izquierdos; aunque sorprendido inicialmente, reaccionó y huyó del lugar. Se encontró con el coacusado Raúl, a quien se le había trancado el rifle. Lo empujó y corrió hacia el monte, donde estuvo alrededor de media hora. Después caminó hasta una casa y pidió ayuda. Oportunamente, lo llevaron y quedó hospitalizado en Centro Médico de Río Piedras. Reynoso Esquilín fue el único sobreviviente; los demás fueron asesinados en el lugar.

*El uso múltiple y el alto calibre de todas las armas involucradas generó un gran ruido, que se escuchó en los alrededores.* Luego de esta masacre, los asesinos Mario, Armando, Raúl, Antonio y Andy montaron a dos (2) de las víctimas en el asiento trasero del Honda Accord y a las otras dos (2) las metieron en el baúl. Andy se fue guiando ese vehículo y Mario lo siguió detrás en su Porche. Al rato llegó una guagua Trooper llena de policías. Uno de los

---

([7]) En el juicio, el testigo de cargo, Reynoso Esquilín, identificó unas fotos presentadas como evidencia. T.E., Vol. I, págs. 39–44). Con vista al *Exhibit* I, la casa de Mario, indicó el lugar exacto donde observó a la acusada Doña Julia y el lugar por donde él huyó.

Identificó, además, las fotografías de las víctimas de la masacre. Expuso que cuando mencionó a Doña Julia, un (1) año después de los hechos, en su segunda declaración, no lo hizo para presionar a Mario, quien se encontraba prófugo. T.E., Vol. II, pág. 106.

agentes se llevó una gorra verde y negra y una tenis pertenecientes a Julito.

*Esa noche, la hermana de Mario limpió con una manguera la sangre de la marquesina; mientras lo hacía, Doña Julia la observaba desde la misma casa de su hijo Mario.*

Mario y Andy dejaron el auto Honda con los cadáveres en un sitio detrás de una estación de gasolina texaco, Sector La Muda, Guaynabo. Al otro día fueron descubiertos por un empleado de la gasolinera, quien llamó a la Policía.

Con motivo de ese descubrimiento, se inició una investigación. El agente Negrón Meléndez, de la División de Homicidios del Centro de Investigaciones Criminales (C.I.C.) de Bayamón, en unión a su compañero Edwin Vélez, se presentaron al sector La Muda. Al llegar, vieron en el Honda Accord los dos (2) cadáveres. El automóvil mostraba la gran balacera, pues tenía impactos de bala en el panel trasero y pedazos de carne pegados en la puerta del lado derecho, el bonete y el guardalodo. T.E. de 27 de octubre de 1993, pág. 8. El Honda Accord aparecía informado como hurtado. Oportunamente, llegó la Fiscal Maritza Morales Villamil y se tomaron numerosas fotos al auto Honda y a los cadáveres. Por instrucciones de la Fiscal se sacaron las llaves del encendido y también a los dos (2) cadáveres. Poco después, los agentes notaron unas manchas de sangre en la parte trasera del vehículo y abrieron el baúl. Encontraron dos cadáveres más que estaban destrozados y los sacaron del baúl. El agente Negrón Meléndez registró todos los cadáveres e hizo un inventario de sus pertenencias. Éstos fueron trasladados, en unión del Honda Accord, para fines de autopsias e identificación, respectivamente.

Con motivo de una confidencia en cuanto *al lugar donde habían ocurrido los hechos, y quién era el dueño de la residencia,* el agente Negrón Meléndez fue al Centro Médico a ver a Reynoso Esquilín, quien estaba hospitalizado por razón de sus heridas. Aunque al principio Reynoso Esquilín estaba muy temeroso, luego decidió ofrecerles información.

T.E., Vol. I, págs. 28–30. En su *primera* declaración jurada sólo mencionó a Mario, porque estaba preocupado por su familia y describió a los demás. En la *segunda* declaración jurada dijo los apodos de las demás personas que participaron y encontraban en el lugar.

A base de la investigación realizada y demás datos obtenidos, y con apoyo en la declaración e información recibida de Reynoso Esquilín, el agente Negrón Meléndez fue a la residencia de Doña Julia y la citó para el 4 de febrero. Ella compareció con su hija Rosa. *Allí se le informó de los motivos por los cuales había sido citada. Se le preguntó si sabía algo de los hechos, si había escuchado algún tiroteo o disparo en el sitio.* Ella respondió que *no sabía nada,* que no *había escuchado nada.* T.E. de 27 de octubre de 1993, pág. 65.

En esta entrevista, el agente Negrón Meléndez *le explicó* en *detalles* a Doña Julia la razón de ésta:

> P  ¿Qué fue lo que usted le explicó?
> R  Bueno, yo le expliqué que nosotros teníamos información *de que en la residencia de su hijo, de Mario, había ocurrido un tiroteo donde habían ejecutado a cuatro personas.* Le expliqué la *fecha, la hora,* le expliqué donde *habían aparecido los cadáveres* y en base a eso, pues, *le pregunté si ella sabía algo de eso, si había escuchado y ella dijo que no sabía nada.*
> P  Dijo que *no sabía nada.*
> R  Que no sabía nada, *que no había escuchado nada, que no sabía nada.*
> P  ¿Y que *no había escuchado nada?*
> R  *No, señor* (Énfasis suplido.) T.E. de 27 de octubre de 1993, pág. 66.[8]

*A modo de paréntesis,* la opinión de conformidad incurre en *el error adjudicativo de aislar este testimonio del resto de la prueba.* Una vez integrado éste a toda la prueba des-

---

[8] En el *contrainterrogatorio,* a preguntas del abogado de Doña Julia, el agente Negrón Meléndez reiteró:

"R.  Sí, se le preguntó si sabía algo de las *muertes.*

"P.  Y ella contestó que *no sabía nada, que no había escuchado nada.*" (Énfasis suplido.) T.E. de 28 de octubre de 1993, pág. 193.

filada y aquilatada por el Jurado, surge claramente la *especificidad* del agente Negrón Meléndez. ¿Cómo pueden tacharlo de "sumamente vago a los fines de determinar *específicamente* cuál fue la información que se le requirió a ésta y cuáles fueron realmente los hechos que negó saber la acusada"? (Énfasis suplido.) Opinión de conformidad, pág. 409 esc. 5. *Con todo respeto, el absurdo de este limitado enfoque conlleva a sustituir el análisis y la psicodinámica adjudicativa del Jurado.* Sólo así se entiende que, a renglón seguido, para justificar eximirla del delito de encubrimiento, se penetre el estado mental de Doña Julia y especule en cuanto a la ausencia del elemento de intención específica: "[e]s *probable que ésta realmente creyera que nada sabía de los hechos por no haberlos presenciado.*" (Énfasis suplido.) Íd.

Aclarado este extremo, la prueba también revela que se citó a Doña Julia para que, al día siguiente, prestara una declaración jurada. Compareció acompañada del Lcdo. Rubén Cerezo, pero la Fiscal no se encontraba, por lo que se marchó. El licenciado Cerezo le dijo al agente Negrón Meléndez que Doña Julia no estaba dispuesta a declarar. T.E. de 27 de octubre de 1993, pág. 67.

Poco después, el agente Negrón Meléndez obtuvo una orden de allanamiento para registrar la residencia de Mario. Se diligenció el 7 de febrero. El registro fue filmado en vídeo por el agente Morales.

Cuando los agentes llegaron a la dirección indicada encontraron a Doña Julia y a Sonia, hermana de Mario. Al mostrarle la orden a Sonia, ésta accedió a abrir la puerta de la casa, para lo cual *tuvo que ir a casa de Doña Julia a buscar la llave.* La casa de Mario estaba prácticamente vacía; sólo había parte de un juego de cuarto y una cama.

En la marquesina, los agentes investigadores *encontraron evidencia* consistente en un *casquillo de bala de 9mm*; además, en una de las paredes enchapadas en piedra de río, encontraron *un pedazo de tela verde y un plomo de*

*proyectil* de bala disparado, y varios *cartuchos de escopeta disparados*. T.E. de 27 de octubre de 1993, págs. 57–60.

Las paredes de la marquesina tenían varios impactos de bala, *que habían sido tapados con masilla*. T.E. de 27 de octubre de 1993, pág. 60 (*Exhibit* 6(a)-(f) del Pueblo). Se le mostró a Doña Julia y a su hija todo lo ocupado. Se le entregó un recibo a Doña Julia, el cual ésta firmó.

## IV

Lo expuesto nos permite concluir que, en el caso de autos, se desfiló abundante prueba *directa y circunstancial*(⁹)

---

(⁹) De los hechos probados e inferencias razonables sabemos que Doña Julia se percató, con anticipación, de la presencia de su hijo Mario y demás acompañantes, quienes se encontraban fuertemente armados. Ver varias personas portando armas de alto calibre no es un evento ordinario; salvo por personas autorizadas, ello constituye un delito. Además, puede ser indicativo de que se ha perpetrado o está próximo a cometerse un acto delictivo. Un ciudadano común no posee este tipo de armas, menos aún, las exhibe públicamente. El uso de las armas por Mario y demás coautores tuvo que haber causado un ruido estruendoso en el área, en consideración al calibre de las armas, la cantidad de balas disparadas y la estructura cerrada de la marquesina. También, por el asombro por parte de las víctimas, algún tipo de algarabía, grito o expresión debió haberse escuchado. De ordinario, luego de efectuada una masacre de este género, los asesinos tardan algún tiempo en abandonar la escena. Aquí no solamente debieron tardar, sino que es normal que una persona común —ante lo inusitado de los hechos ocurridos— se percatara de cómo los cadáveres eran recogidos de la escena y "acomodados" en el vehículo Honda Accord. Los homicidas debieron comunicarse y hablar entre sí luego de los hechos, lo cual pudo haber sido escuchado por Doña Julia, ello en vista de la cercanía de su residencia a la de los hechos del crimen, los cuales ocurrieron casi en el patio de su residencia. Considerado el calibre de las armas utilizadas y la cercanía de las víctimas, el desmembramiento de los cuerpos resultó evidente, al punto que trozos de carne humana y vestimenta fueron hallados incrustados en la carrocería del vehículo. Es razonable concluir, que en los alrededores de la marquesina (paredes y piso) también debieron hallarse residuos de balas, huellas de impactos, sangre y tejido humano. Doña Julia debió percatarse quién rellenó con masilla los orificios de bala reflejados en las paredes de la residencia y cuál era su propósito. Como mínimo, tuvo que saber que se rellenaron. Doña Julia debió haber comentado sus impresiones sobre lo acontecido con su hija Rosa, sobretodo cuando vio a esta última que limpió el área (de sangre y demás residuos) en su presencia. Considerados todos los factores en conjunto, Doña Julia tuvo que percatarse de la masacre allí ocurrida, que se sacaron los cadáveres y el automóvil Honda, que se limpió la sangre de la marquesina y trataron de ocultarse los impactos de la balacera, y que todo había ocurrido en la marquesina de Mario.

No obstante, su actitud ante las preguntas de los investigadores fue negar todo conocimiento (no vio ni escuchó los disparos) y afirmar que no había ocurrido nada. Semejante respuesta es *inverosímil* en vista de toda la prueba testifical y circunstancial desfilada, la cual fue evaluada, creída y adjudicada por el Jurado. Reconocido es el hecho de que, el mero acto de negar conocimiento de un hecho delictivo a las

a los efectos de que Doña Julia observó en la casa de su hijo Mario a los individuos que portaban armas de fuego cinco (5) minutos antes de la masacre. Además, que su hijo Mario le dijo que entrara a la residencia y, poco después, se inició la balacera que concluyó con los cuatro jóvenes asesinados a sangre fría. También, que oyó los inumerables disparos y después presenció *cuando se lavaba la marquesina para sacar las manchas de sangre.*

La evidencia circunstancial es intrínsecamente igual que la evidencia directa o testifical. *Pueblo v. Salgado Velázquez*, 93 D.P.R. 380 (1966). En *Pueblo v. Bonilla*, 75 D.P.R. 152, 160–161 (1955), citando a *Holland v. United States*, 348 U.S. 121, 139–140 (1954), dijimos:

> "Evidencia circunstancial a este respecto es intrínsecamente igual que la evidencia directa o testifical. Se admite que la evidencia circunstancial puede en algunos casos conducir a un resultado enteramente incorrecto. Sin embargo esto es igualmente cierto de la evidencia testifical. En ambos casos, el jurado está llamado a pesar las ocasiones en que la evidencia correctamente indica culpabilidad frente a la posibilidad de una equivocación o una inferencia ambigua. *En ambos casos, el jurado debe usar su experiencia con la gente y con los sucesos de la vida al apreciar las probabilidades.* Si el jurado queda convencido fuera de duda razonable, nada más podemos exigir." (Énfasis en el original suprimido y énfasis suplido.)

Aquí la prueba circunstancial fue *creída* por el Jurado, como lo revela el veredicto de *culpabilidad.* Esas determinaciones merecen *gran deferencia. Pueblo v. Torres Rivera*, 137 D.P.R. 630 (1994); *Pueblo v. Falcón Negrón*, 125 D.P.R. 75 (1990); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981). En ausencia de error, prejuicio o parcialidad, no intervendremos, pues ellos están en mejor posición de aquilatar la cre-

---

autoridades, por si sólo, no constituye un encubrimiento. No obstante, cuando se demuestra que la persona conocía sobre el evento e intencionalmente mintió con el propósito de obstaculizar o desviar los esfuerzos de las autoridades en la captura del delincuente, *incurre en conducta constitutiva de encubrimiento.* La conducta de Doña Julia es hasta cierto punto comprensible, pues se trata de la madre del principal autor del delito; no obstante, ello no es exención ni puede considerarse como un elemento decisivo al momento de juzgar semejante conducta.

dibilidad de los testigos, medir su conducta en la silla testifical e integrar esos testimonios a la prueba documental y de carácter objetivo. *Pueblo v. Torres Rivera*, supra.

No se debate seriamente que para encontrar responsabilidad como *coautor*, la mera presencia no es suficiente; hay que establecerla por actos anteriores o coetáneos como resultado de una conspiración o de un designio común. *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994); *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992); *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 145 (1985). Ahora bien, es distinto, pues para probar el encubrimiento basta establecer que se tenía *conocimiento* del delito cometido y *se procuró desaparecer, alterar u ocultar evidencia*. A estos fines, la mera presencia durante la comisión de un delito *es suficiente para demostrar dicho conocimiento*.

## V

*Recapitulemos*, de la prueba no contradicha y creída *por el Jurado*, es imperativo concluir que el Ministerio Fiscal probó más allá de duda razonable el delito de encubrimiento.

*No estamos ante una insuficiencia de prueba*. Al poner en su lugar las piezas de este *mosaico evidenciario*, es claro que Mario y los demás autores de la masacre sacaron de la marquesina los cadáveres y los llevaron en el automóvil Honda Accord hurtado al sector La Muda en Guaynabo, con el propósito de eliminar todo rastro que pudiera llevar a la Policía a la *verdadera escena* del crimen —la residencia de Mario— *lo cual, de su faz, lo incriminaba inequívocamente*.

Para ocultar y tapar el sitio de la masacre, fue necesario, además, remover todo rastro físico dejado por las balas y la sangre en dicha marquesina. Ello explica el lavado de la sangre, el porqué se rellenaron con masilla los huecos en las paredes creados por los impactos de las balas y se reco-

gieron y desaparecieron los numerosos casquillos y demás huellas de los crímenes. De nada hubiese valido el traslado de los cadáveres y sacar el automóvil Honda Accord fuera de la marquesina de Mario *sin tratar, coetáneamente, esa noche de alterar, como se hizo, ese escenario y desaparecer todos los indicadores producto de la masacre.* El conocimiento de Doña Julia es manifiesto; su negativa a informarlo al serle requerido y, para confundir la investigación, dar información falsa de que *no había visto ni oído nada (disparos), configuró el delito de encubrimiento.*

¿Cómo puede la sentencia mayoritaria *sustituir el juicio del Jurado?* Con todo respeto, nos resulta difícil entender la lógica y nos preocupa la razón de decidir mayoritaria. *Ciertamente, la relación materno-filial no debería ser eximente.* Acertadamente expone el Procurador General en su Petición de *certiorari*, pág. 15:

> Es evidente que estas actuaciones de la recurrida están dirigidas a proteger a su hijo, autor de tan horrendo crimen. Curiosamente señala Dora Nevares en su obra que el borrador de Miró Cardona del Código Penal, proponía como excusa legal absolutoria cuando se encubre al cónyuge ascendiente, descendiente o familiares. *Op. cit.*, pág. 399. *El legislador no adoptó tal excusa al aprobarse el Código Penal.* Por tanto, podemos afirmar que la recurrida incurrió en la conducta delictiva imputada y ello quedó demostrada por la evidencia suficiente presentada por el Ministerio Público. Además, el jurado, a quien le correspondía dirimir los conflictos en la prueba y adjudicar credibilidad, así lo hizo al rendir un veredicto de culpabilidad. No podía el juez usurpar las funciones del jurado y sustituir su criterio por el propio. Al hacer esto, erró gravemente. (Énfasis suplido y escolio omitido.)[10]

Como dijimos el inicio de este disenso, del hecho nace el derecho (*ex facto oritur ius*). De los méritos intrínsecos y la

---

[10] Conde-Pumpido Ferrerro, *op. cit.*, pág. 318, explica que esta exención "es índice claro de que el motivo de la misma es la presunción 'iuris et de iure' de que el familiar que encubre lo hace movido por los vínculos de afecto y de solidaridad que lo unen con el delincuente. La idea de comunidad familiar, obliga a una posición defensiva de ella que se refleja en una protección a cualquier miembro de la familia que se vea en peligro, por lo que se tiende a disculpar a quien obra movido por ese impulso de defensa familiar".

sabiduría de nuestras sentencias, dictámenes y resoluciones depende, en última instancia, la fe ciudadana en la justicia.

Si ante estos dramáticos hechos, la conducta activa y afirmativa de Doña Julia no constituye *encubrimiento*, ¿cuál?[11]

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La sentencia mayoritaria que emite el Tribunal en el presente caso —Sentencia que encuentra su "razón de ser" en la opinión de conformidad que se emite— es tan errónea y peligrosa que, *no obstante suscribir la opinión disidente que en el caso emite el Juez Asociado Señor Negrón García*, nos vemos en la obligación de expresarnos por separado.

El resultado al que se llega en la referida sentencia y en la mencionada opinión de conformidad es ciertamente uno erróneo. Lo verdaderamente alarmante, sin embargo, y lo que hace que dicha actuación sea una peligrosa y perjudicial a nuestro sistema de justicia criminal, lo es la norma que la Mayoría intenta establecer en nuestra jurisdicción por medio de la misma.

En la referida opinión de conformidad, pág. 403, se expresa que:

> Como establecimos previamente, para incurrir en el delito debe mediar la *intención específica* de ayudar al autor de un delito a eludir la acción de la justicia. En vista de su naturaleza específica, para configurar este elemento *se requieren actos de*

---

[11] " 'La regla, enunciada a menudo, de que los estatutos penales deben interpretarse restrictivamente, no exige que a las palabras de un estatuto deba dárseles su significado más limitado o que deba hacerse caso omiso de la evidente intención del legislador.' " *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 903 (1987), citando a *Pueblo v. Mantilla*, 71 D.P.R. 36, 44 (1950). Véanse, además: *Pueblo v. De León Martínez*, 132 D.P.R. 746 (1993); *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988); *Pueblo v. Burgos Torres*, 120 D.P.R. 709 (1988).

*los cuales se pueda inferir claramente el propósito de asistir a un sujeto en evadir la justicia.*

A diferencia de los casos de desaparición o de alteración de la prueba —actos afirmativos en los cuales sea palpable la intención de asistir al autor del delito— *el ámbito de los interrogatorios plantea una situación particular que requiere de un examen cuidadoso del testimonio ofrecido para evaluar si de la manifestación se puede deducir esta intención específica.* En este contexto, la intención se puede inferir de declaraciones en las que de modo afirmativo se presenta una coartada engañosa o se ofrece información falsa para despistar o desviar la atención de las autoridades o para confundir la investigación. *Sin embargo, cuando en un interrogatorio se niega, sin más, el conocimiento sobre unos hechos delictivos, que se supongan conocidos, no se conforma el acto afirmativo que intima el delito de encubrimiento. La conducta pasiva, consistente en la mera negación de conocimiento, no es suficiente para demostrar esta intención específica de ayudar al autor del delito a evadir la justicia.* (Énfasis en el original suprimido y énfasis suplido.)

Independientemente de los hechos específicos del presente caso, y conforme o acorde con lo expuesto por la mayoría de los integrantes del Tribunal, *una persona que observa la comisión de un delito público y que conoce y puede identificar a los autores del mismo no infringe las disposiciones de los Arts. 36 y 236 del Código Penal de Puerto Rico, 32 L.P.R.A. secs. 3173 y 4432, al ser preguntado por un funcionario competente sobre su conocimiento al respecto y negar todo conocimiento sobre ello.*

Ello, conforme la mencionada Mayoría, por razón de que se trata de una "conducta pasiva" que, *alegadamente,* "no es suficiente para demostrar [la] intención específica de ayudar al autor del delito a evadir la justicia"; requiriéndose para la configuración del delito de encubrimiento, según entiende la Mayoría, "de actos adicionales como 'ayudar al autor del delito principal a escapar, participar en actos dirigidos a desaparecer la evidencia, ... *dar información falsa a las autoridades con el propósito de confundir la investigación'* ". (Énfasis en el original.) Opinión de conformidad, págs. 403–404.

Esto es, acorde con el razonamiento de los mencionados compañeros Jueces, si la persona que observó la comisión del delito y que conoce la identidad de los perpetradores del mismo, al ser cuestionado por las autoridades informa que el perpetrador del delito lo fue "Juan Pérez", cuando realmente fue otro, éste *sí* comete el delito de encubrimiento; *no* así cuando la persona meramente dice que no tiene conocimiento alguno de lo sucedido.

*No* se percata, aparentemente, la Mayoría del hecho de que, *en ambas situaciones*, esa persona está mintiendo y su mentira entorpece y/o frustra la investigación policiaca e impide el esclarecimiento de los hechos delictivos; *esto es, en ambas ocasiones, la persona está protegiendo o encubriendo al responsable de los hechos bajo investigación.* Dicho de otra forma, "el propósito de asistir a un sujeto a evadir la justicia", o la intención específica de entorpecer la investigación y de encubrir al responsable de los hechos delictivos, *se puede inferir tanto de la situación afirmativa en que se mal orienta al investigador como de la pasiva en que se niega total conocimiento de los hechos delictivos.*

Rechazamos enérgicamente, por último, la posición de la Mayoría a los efectos de que su actuación es una acorde con el principio de que los estatutos penales deben ser interpretados restrictivamente. Aquí *no* se trata de la "interpretación restrictiva" de las disposiciones de los Arts. 36 y 236 del vigente Código Penal, *supra*. De lo que aquí se trata es de una *interpretación totalmente errónea* de un estatuto. Ello en *detrimento y perjuicio* de una ciudadanía que está siendo azotada por una ola criminal que la está estrangulando.

Decisiones erróneas como las hoy emitidas ciertamente no ayudan a combatir la criminalidad en nuestra jurisdicción. Realmente resulta difícil concebir una norma más dañina que la hoy implantada por la Mayoría. Mediante la misma el Tribunal, a todos los fines legales prác-

ticos, le ha brindado *"inmunidad"* al ciudadano irresponsable que, no obstante tener conocimiento personal de unos hechos delictivos, impunemente podrá negar dicho conocimiento.